# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

THE FOUNDATION FOR GOVERNMENT
ACCOUNTABILITY,

                    Plaintiff,

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, XAVIER BECERRA
*in his official capacity as Secretary of
HHS*, U.S. DEPARTMENT OF LABOR,
JULIE A. SU *in her official capacity as
Acting Secretary of Labor*, U.S.
DEPARTMENT OF THE TREASURY, *and*
JANET YELLEN *in her official capacity
as Secretary of the Treasury*,

                    Defendants.

No. 2:23-cv-207

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ..................................................................................1

STATEMENT OF MATERIAL FACTS .................................................3

BACKGROUND ....................................................................................6

    I.     Price transparency is essential for affordable healthcare. ................6

    II.    Congress promised the public price transparency. ...........................8

    III.   The Agencies implemented Congress' instructions with the TiC Rule. ..................................................................................................9

    IV.   The Agencies adopted policies changing the TiC Rule without notice and comment. ..........................................................................12

    V.    Because of the Agencies' Policies, FGA cannot access price information important to its mission. .................................................13

STANDARD OF REVIEW ...................................................................16

ARGUMENT .......................................................................................17

    I.     The Prescription Drug and Safe Harbor Policies are legislative rules that violate the APA. ...............................................................17

    II.    This Court should vacate the Policies and grant declaratory and permanent injunctive relief. .............................................................21

        A.    This Court should set aside the Policies. .....................................21

        B.    This Court should also grant declaratory and permanent injunctive relief ............................................................................23

CONCLUSION ....................................................................................25

STATEMENT REGARDING ORAL ARGUMENT ............................25

CERTIFICATE OF SERVICE .............................................................27

# TABLE OF AUTHORITIES

## CASES

*Alabama v. CMS*,
  674 F.3d 1241 (11th Cir. 2012) ...................................................................22

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ....................................................................3

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ..................................................................18

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
  715 F.2d 897 (5th Cir. 1983) ......................................................................17

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019) ...............................................................................22

*Cate v. Oldham*,
  707 F.2d 1176 (11th Cir. 1983) ..................................................................24

*Chamber of Com. v. HHS*,
  6:21-cv-309 (E.D. Tex.) ..............................................................................12

*Clean Air Council v. Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017) ...................................................................19, 20

*Data Mktg. P'ship v. DOL*,
  45 F.4th 846 (5th Cir. 2022) .......................................................................22

*FGA v. CMS*,
  2:22-cv-534 (M.D. Fla.) ..............................................................................15

*Franciscan All., Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) .......................................................................22

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ....................................................................................18

*Health Freedom Def. Fund, Inc. v. Bide*n,
  599 F. Supp. 3d 1144 (M.D. Fla. 2022) ...................................................3, 17

*Hewitt v. Comm'r of IRS*,
  21 F.4th 1336 (11th Cir. 2021) ...................................................................18

*Humane Soc'y of the U.S. v. USDA*,
    41 F.4th 564 (D.C. Cir. 2022) ........................................................................20

*Int'l Union, United Mine Workers of Am. v. MSHA*,
    407 F.3d 1250 (D.C. Cir. 2005).....................................................................18

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2013) .........................................................................17

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) .....................................................................17

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)............................................................................25

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014)..........................................................3, 18, 19

*N.H. Hosp. Ass'n v. Azar*,
    887 F.3d 62 (1st Cir. 2018)............................................................................17

*Nat'l Mining Ass'n v. Sec'y of Labor*,
    153 F.3d 1264 (11th Cir. 1998) .....................................................................22

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998).....................................................................22

*NRDC v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018)............................................................................20

*NRDC v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020).........................................................................22

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ..............................................................17

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)...........................................................................17, 18, 20

*Protect Democracy Project, Inc. v. DOJ*,
    498 F. Supp. 3d 132 (D.D.C. 2020) .........................................................22, 24

*Scenic America v. DOT*,
    836 F.3d 42 (D.C. Cir. 2016).........................................................................21

*Scott v. Roberts*,
  612 F.3d 1279 (11th Cir. 2010) ....................................................24

*United States v. Hawkes*,
  578 U.S. 590 (2016).........................................................................21

*W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*,
  59 F.4th 1124 (11th Cir. 2023).....................................................23

*Warshauer v. Solis*,
  577 F.3d 1330 (11th Cir. 2009) ....................................................18

**STATUTES**

42 U.S.C. §18031 .............................................................................3, 8, 9

42 U.S.C. §300gg-15a .......................................................................3, 8

5 U.S.C. §551 .........................................................................................17

5 U.S.C. §553 ...................................................................................17, 18

5 U.S.C. §706 ...................................................................................17, 22

**OTHER AUTHORITIES**

85 Fed. Reg. 72158 (Nov. 12, 2020) ........................................*passim*

84 Fed. Reg. 65464 (Nov. 27, 2019) ...............................3, 7, 10, 11

Caterina DiBiase, *et al.*, *Status of Healthcare Price Transparency
  Across the United States*, Pioneer Institute (May 2020),
  perma.cc/HX7Y-K2YG ........................................................................8

Dublois & Ingram, *How America's Hospitals Are Hiding the Cost of
  Health Care*, FGA (Aug. 29, 2022), perma.cc/LH68-BSG4 ...........14

Executive Order 13877, 84 Fed. Reg. 30849 (June 24, 2019) ......................9, 10

*FAQs About Affordable Care Act and Consolidated Appropriations
  Act, 2021 Implementation Part 49* at 1 (Aug. 20, 2021),
  perma.cc/YLW4-VVTF...............................................................*passim*

*FAQs About Affordable Care Act Implementation Part 53*
  (Apr. 19, 2022), perma.cc/2KA4-9X59 ..................................*passim*

FGA, *FGA Applauds Senators Braun and Murkowski for Filing the Promising Pathway Act (PPA) During Senate HELP Committee Markup* (June 14, 2022), perma.cc/BX3R-F242 ........................14

FGA, *Protecting Patients' Pocketbooks*, perma.cc/D9JZ-4VGW ......................14

James L. Madara, MD, Letter to Sen. Bill Cassidy, MD, *et al.*, Am. Med. Ass'n (Mar. 23, 2018), bit.ly/42sFiMF ........................................6, 7

Premera Blue Cross, *Transparency in Coverage Rule*, perma.cc/W2FK-E76U ....................................................................13, 19

Rich LeBoutillier, *Know Before You Go: CMS Should Use Hospital Price Transparency Rule Enforcement to Encourage Consumer-Driven Health Care for Cost Containment*, J. of Health Care Fin. (2023), bit.ly/3NhXHpC ................................................................6, 7

United Healthcare, *Transparency in Coverage Rule*, perma.cc/7P4M-4GJC ....................................................................13, 19

## RULES

45 C.F.R. §147.210 ..................................................................10, 11

45 C.F.R. §147.211 ........................................................................12

45 C.F.R. §147.212 ..................................................................*passim*

Fed. R. Civ. P. 56........................................................................1, 16

Plaintiff, the Foundation for Government Accountability, moves for summary judgment on its claim that the Defendant federal agencies acted unlawfully in changing the terms of the Transparency in Coverage Rule, 85 Fed. Reg. 72158 (Nov. 12, 2020) (Ex. B), without going through notice and comment. *See* Fed. R. Civ. P. 56.

## INTRODUCTION

The absence of clear price information in healthcare is a major problem. Even sophisticated parties face extreme difficulty when trying to find accurate information about prices. The lack of reliable information about prices has consequences. Patients are unable to shop for higher-value care, and may even face financial ruin because of a surprise bill. *See* 85 Fed. Reg. at 72161. Opaque pricing also makes improvements to the healthcare system more difficult. The efforts of groups to conduct research and recommend policies to improve the healthcare system are frustrated by an inability to obtain reliable price information. Plaintiff, the Foundation for Government Accountability, is one such group.

Defendants—the federal Departments of Health and Human Services, Labor, and Treasury—acted to address the problem of opaque healthcare pricing in the landmark Transparency in Coverage (TiC) Rule. This Rule was adopted in 2020 based on an enormous record developed through notice-and-comment rulemaking procedures. The final TiC Rule requires health insurance

issuers and group health plans to report price information for three different categories of items: in-network rates, out-of-network allowed amounts, and prescription drug negotiated rates and historical net prices. 45 C.F.R. §147.212(b). This crucial information must be reported in "dollar amounts." *Id.*

The Agencies, however, got cold feet and effectively revoked key requirements of the TiC Rule through FAQs issued without notice and comment. Shortly before the January 1, 2022 effective date for the TiC Rule, the Agencies adopted the Prescription Drug Policy. This Policy "defer[s] enforcement" of the mandate to report prescription drug pricing information. *See* Ex. C, *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 49* at 1 (Aug. 20, 2021), perma.cc/YLW4-VVTF. Later, the Agencies adopted the Safe Harbor Policy. This Policy excused health insurance issuers and group plans from the requirement to provide some in-network pricing information in dollar amounts. Ex. D, *FAQs About Affordable Care Act Implementation Part 53* (Apr. 19, 2022), perma.cc/2KA4-9X59.

The Prescription Drug and Safe Harbor Policies unlawfully changed the TiC Rule's disclosure requirements without going through the required notice-and-comment procedures. By removing the obligation to report prescription drug prices at all and waiving the requirement to report some in-network items and services in dollar amounts, these Policies substantively modified the TiC Rule's mandates in violation of the Administrative Procedure Act. *See Mendoza*

*v. Perez*, 754 F.3d 1002, 1021, 1024 (D.C. Cir. 2014). This Court should grant summary judgment and set aside this unlawful agency action.

### STATEMENT OF MATERIAL FACTS*

1.    Section 1311 of the Affordable Care Act (ACA) requires health plans and insurers on insurance exchanges to make certain information available to the public. *See* 42 U.S.C. §18031(e)(3). This requirement also extends to health insurers and group plans that are not on an exchange. *Id.* §300gg-15a. In addition to listed information, insurers and group plans must disclose "[o]ther information as determined appropriate by the Secretary" of Health and Human Services. *Id.* §18031(e)(3).

2.    The Department of Health and Human Services, Department of Labor, and Department of the Treasury implemented this directive through the TiC Rule. *See* 85 Fed. Reg. 72158.

3.    The Agencies issued a notice of proposed rulemaking on November 27, 2019. *See* 84 Fed. Reg. 65464. After reviewing and considering thousands of comments and a massive rulemaking record, they issued the final rule on November 12, 2020. *See* 85 Fed. Reg. 72158.

---

* In this APA challenge, "the entire case on review is a question of law" and "the district judge sits as an appellate tribunal." *Health Freedom Def. Fund, Inc. v. Bide*n, 599 F. Supp. 3d 1144, 1156 (M.D. Fla. 2022) (cleaned up) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). For this reason, FGA does not believe that this statement of material facts is necessary for the resolution of this case, but includes it for completeness and to ensure compliance with the Court's scheduling order. *See* Doc. 32, at 4.

4.      The TiC Rule requires disclosure of "negotiated rates and historical net prices for covered prescription drugs." 45 C.F.R. §147.212(b). It also requires disclosure of "in-network provider rates for covered items and services." *Id.* These costs must be reported in "dollar amounts." *Id.*

5.      On August 20, 2021, the Agencies announced that they would "defer enforcement of the TiC Final Rules' requirement that plans and issuers publish … prescription drug pricing pending further rulemaking." Ex. C, at 1. This Prescription Drug Policy remains in effect.

6.      On April 19, 2022, the Agencies adopted an "enforcement safe harbor for satisfying" the requirement to report certain in-network information in dollar amounts. Ex. D, at 2. The safe harbor applies to "plans and issuers that use alternative reimbursement arrangements that do not permit the plans and issuers to derive with accuracy specific dollar amounts contracted for covered items and services in advance of the provision of that item or service, or that otherwise cannot disclose specific dollar amounts according to the schema as provided in the Departments' technical implementation guidance." *Id.* This Safe Harbor Policy remains in effect.

7.      The Foundation for Government Accountability (FGA) is a non-partisan, non-profit organization that helps millions achieve the American dream by improving welfare, work, healthcare, and election integrity policy in the states and in Washington, D.C. Ex. E, at 2, ¶3 (Ingram Decl.).

4

8.    Promoting policies that would improve the healthcare system is an important part of FGA's mission. FGA conducts research to decide which healthcare policies will benefit healthcare consumers and eliminate waste and inefficiency. It then promotes those policies to policymakers and the public. *Id.* at 2, ¶4.

9.    Price transparency is important to FGA's ability to conduct research and promote policies based on that research. Accurate price information allows FGA to conduct research to identify inefficiencies and policies that would improve the healthcare market. *Id.* at 3, ¶8.

10.    To fulfill its mission of promoting higher quality and more affordable healthcare for every American, FGA wants to obtain the pricing information for prescription drugs and in-network items and services required to be disclosed under the TiC Rule, use that information for its research and formulation of policy recommendations, and disseminate information about that research and the resulting policy recommendations to policymakers and the public. *Id.* at 3-5, ¶¶9-11.

11.    Because plans and insurance issuers have not been required to fully disclose this information due to Defendants' unlawful amendments of the TiC Rule, FGA cannot access, use, or disseminate this information to advance its mission. *Id.* at 4-5, ¶¶10-12.

5

12.    If the prescription drug and in-house pricing information were available, FGA would access that information, use it for research on policy proposals, and use it to communicate about its preferred proposals. *Id.*

## BACKGROUND

### I.    Price transparency is essential for affordable healthcare.

For years, the healthcare system has failed to provide the public with price information that would enable patients to find the best care for them and permit assessment of healthcare policies. James L. Madara, MD, Letter to Sen. Bill Cassidy, MD, *et al.* at 2, Am. Med. Ass'n (Mar. 23, 2018), bit.ly/42sFiMF (Madara Letter). Patients "do not typically know whether they could have received the same service from another provider at lower prices," even though they remain responsible for "paying out-of-pocket expenditures." 85 Fed. Reg. at 72160-61. Third parties "negotiate prices" and "reimburse costs directly to health care providers." *Id.* at 72160. Patients often learn the price "only after services are rendered" when they get a bill or explanation of benefits. *Id.*

This lack of transparency harms patients, who can be stuck with surprise bills. *See id.* These surprise bills can push patients who never knew the price of care they received into ruinous debt. *See* Rich LeBoutillier, *Know Before You Go: CMS Should Use Hospital Price Transparency Rule Enforcement to Encourage Consumer-Driven Health Care for Cost Containment* at 7-8, J. of Health Care Fin. (2023), bit.ly/3NhXHpC. The risk of financial ruin causes

some patients to skip or delay needed care, contributing to worse health outcomes. *Id.* at 8; Madara Letter at 15.

Lack of transparency also harms the broader healthcare market. To begin, patients who lack price information cannot "shop for health care … efficiently." 84 Fed. Reg. at 65465-66. As a result, "market forces" cannot "drive competition" and "lower prices." *Id.* And efforts by researchers, consumer advocates, and policymakers to improve the healthcare system are frustrated by the denial of key information. 85 Fed. Reg. at 72161.

Price transparency would improve healthcare for both patients and the broader system. Price transparency allows consumers to "avoid surprises" and steer clear of high-cost care. *Id.*; *see also* LeBoutillier, *supra* at 7-8. It thus "leads to lower and more uniform pricing in health care markets." 85 Fed. Reg. at 72162. Transparency also contributes to improved healthcare policies and practices. With price transparency, "researchers could better assess the cost-effectiveness of various treatments; state regulators could better review issuers' proposed rate increases; patient advocates could better help guide patients through care plans; employers could adopt incentives for consumers to choose more cost-effective care; and entrepreneurs could develop tools that help doctors better engage with patients." *Id.*

Despite its well-documented benefits, state and private efforts to increase price transparency have been inadequate to effect system-wide

change. Many states have no price transparency laws or only weak and ineffective ones. *See* Caterina DiBiase, *et al.*, *Status of Healthcare Price Transparency Across the United States* at 9, Pioneer Institute (May 2020), perma.cc/HX7Y-K2YG. Only three states require all providers to disclose prices on request except for emergency services. *Id.* at 5-6. Three other states require transparency from only some providers. *Id.* at 6. Other states require transparency only in a narrower set of circumstances. *Id.* at 6-9. With rare exceptions, these requirements do not cover self-insured group health plans that cover most private-sector workers. *See* 85 Fed. Reg. at 72162-63. Private efforts to fill the gap have failed to produce tools that give reliable price information. *Id.* at 72163. The result is a hodgepodge of state laws and ineffective private tools that fail to provide patients and the public with real price information.

## II.   Congress promised the public price transparency.

Congress acted to provide public access to healthcare prices through the Affordable Care Act (ACA). Section 1311 of the ACA requires "transparency in coverage" from health insurance plans. 42 U.S.C. §18031(e)(3). Health plans on insurance exchanges must "make available to the public, accurate and timely disclosure of" certain "information." *Id.* The same requirement extends to "group health plan[s] and … health insurance issuer[s]" that are not on an exchange. *Id.* §300gg-15a.

8

Section 1311 lists several categories of information that health plans must provide. This information includes "[c]laims payment policies and practices," "[d]ata on rating practices," and "[i]nformation on cost-sharing and payments with respect to any out-of-network coverage." *Id.* §18031(e)(3). Individuals must be able to obtain "the amount of cost-sharing" they "would be responsible for … in a timely manner." *Id.* Importantly, health plans must also provide "[o]ther information as determined appropriate by the Secretary" of HHS. *Id.*

Section 1311 includes specific provisions to accomplish its goal of making meaningful information on healthcare prices "available to the public." *Id.* Disclosures must be "submitted … in plain language," meaning "language that the intended audience, including individuals with limited English proficiency, can readily understand and use." *Id.* The Secretaries of HHS and Labor must provide "guidance on best practices of plain language writing." *Id.*

## III.  The Agencies implemented Congress' instructions with the TiC Rule.

Nine years after Section 1311's passage, the President ordered the Secretary of HHS to ensure price transparency. He found that "[o]paque pricing structures [were] benefit[ing] powerful special interest groups … but … leav[ing] patients and taxpayers worse off." Executive Order 13877, 84 Fed. Reg. 30849, 30849 (June 24, 2019). To empower patients to "make fully informed decisions," the President directed HHS to issue regulations to give

patients "information about expected out-of-pocket costs for items or services
… before they receive care." *Id.* at 30849-50.

The Agencies responded by issuing the TiC Rule through notice-and-
comment rulemaking. *See* 85 Fed. Reg. 72158; 84 Fed. Reg. 65464. They issued
the proposed rule on November 27, 2019. 84 Fed. Reg. 65464. They "received
over 25,000 comments in response" and assessed those comments over the next
year. 85 Fed. Reg. at 72167. On November 12, 2020, the Agencies issued the
final TiC Rule, a 150-page document exhaustively discussing and responding
to those comments. 85 Fed. Reg. 72158.

The final TiC Rule requires "public disclosure" of important healthcare
price information. This information includes "in-network provider rates for
covered items and services, out-of-network allowed amounts and billed charges
for covered items and services, and negotiated rates and historical net prices
for covered prescription drugs." 45 C.F.R. §147.212(b). The "negotiated rates"
of prescription drugs refers to "the amount" to be paid to "an in-network
provider, including an in-network pharmacy or other prescription drug
dispenser, for covered items and services, whether directly or indirectly,
including through a third-party administrator or pharmacy benefit manager."
*Id.* §147.210(a)(2)(xvi). A historical net price is "the retrospective average
amount a group health plan or health insurance issuer paid for a prescription
drug." *Id.* §147.210(a)(2)(xi). This price must factor in "any reasonably

allocated rebates, discounts, chargebacks, fees, and any additional price concessions." *Id.*

Consistent with Section 1311's purpose of providing public access, the TiC Rule includes provisions to ensure information is disclosed in a way that the public can understand. The covered prices and rates must be reported in "dollar amounts." *Id.* §147.212(b). They must be "available on an internet website" in a "machine-readable file" that can be "read by a computer system." *Id.*; *id.* §147.210(a)(2)(xi), (xiv).

The TiC Rule includes two safe harbor provisions. The first safe harbor covers mistakes made in "good faith" despite "reasonable diligence" if they are corrected "as soon as practicable." *Id.* §147.212(c)(4). The second safe harbor applies when, "despite acting in good faith and with reasonable diligence," a health plan or issuer's "internet website is temporarily inaccessible," as long as the information is made "available as soon as practicable." *Id.* §147.212(c)(5).

The TiC Rule has an effective date of January 1, 2022, more than a year after promulgation. *Id.* §147.212(c)(1). The Agencies chose this effective date after considering comments requesting as much as a 5-year extension of its proposed effective date. *See* 84 Fed. Reg. at 65490, 65523; 85 Fed. Reg. at 72252-53.

**IV.    The Agencies adopted policies changing the TiC Rule without notice and comment.**

The Agencies never implemented key components of the TiC Rule. Instead, they adopted policies that have eliminated the obligations imposed by the TiC rule without notice and comment.

The Agencies announced two categorical exceptions to the TiC Rule through FAQs on August 20, 2021, shortly after industry groups challenged the requirement to report the historical net prices of prescription drugs in machine readable files violated the APA. *See* Ex. C, at 1; *see also Chamber of Com. v. HHS*, 6:21-cv-309, Doc. 1 (E.D. Tex.). The first exception was a new Prescription Drug Policy. Ex. C, at 1. This exception "defer[red] enforcement of" the "requirement" to "publish machine-readable files relating to prescription drug pricing pending further rulemaking." *Id.* (citing 45 C.F.R. §147.211(b)(1)(iii)). The second exception "defer[red] enforcement of" the "requirement to publish the remaining machine-readable files until July 1, 2022." *Id.* at 2. The Agencies stated that these actions were taken as a matter of "enforcement discretion." *Id.* at 1-2. They encouraged states to "take a similar enforcement approach," and announced that states would not be "failing to substantially enforce this requirement" for adopting the recommended approach. *Id.* at 2. The industry groups dropped their suit five days later. *See Chamber of Com.*, 6:21-cv-309, Doc. 12.

12

The Agencies also adopted a new Safe Harbor Policy through FAQs in April 2022. Ex. D. This Policy created two exceptions to the requirement to report in-network prices in dollar amounts. *Id.* at 2. The first exception applied when "plans and issuers … use alternative reimbursement arrangements that do not permit" them "to derive with accuracy specific dollar amounts contracted for covered items and services in advance." *Id.* The second exception applied when a plan or issuer "otherwise cannot disclose specific dollar amounts according to the schema as provided in the Departments' technical implementation guidance." *Id.* The Agencies announced these exceptions as an "enforcement safe harbor" that they "may revisit … in the future." *Id.* Along with the Safe Harbor Policy, the Agencies provided guidance on how to report these in-network items without dollar amounts. *Id.* at 3.

These categorical exceptions remain in place. As a result, plans and issuers are not providing crucial information required by the TiC Rule "pending further rulemaking." Premera Blue Cross, *Transparency in Coverage Rule*, perma.cc/W2FK-E76U; *see, e.g.*, United Healthcare, *Transparency in Coverage Rule*, perma.cc/7P4M-4GJC. The Agencies have not begun new rulemaking procedures.

## V.   Because of the Agencies' Policies, FGA cannot access price information important to its mission.

FGA is a non-partisan, non-profit organization that helps millions achieve the American dream by improving welfare, work, healthcare, and

election integrity policy in the states and in Washington, D.C. Ex. E, at 2, ¶3. Promoting policies that would improve the healthcare system is an important part of FGA's mission. *Id.* at 2, ¶4. FGA conducts research to decide which healthcare policies will benefit healthcare consumers and eliminate waste and inefficiency in healthcare. *Id.* It then promotes those policies to policymakers and the public. *Id.*

For example, FGA advocated for a federal policy to increase access to medicine for consumers and commended legislators working to advance that policy. Ex. E, at 2, ¶4; *see* FGA, *FGA Applauds Senators Braun and Murkowski for Filing the Promising Pathway Act (PPA) During Senate HELP Committee Markup* (June 14, 2022), perma.cc/BX3R-F242. FGA also endorses state-level policies designed to benefit consumers like a proposal to let patients count low-cost care toward their deductibles even if it is out of network. Ex. E, at 2, ¶4; *see* FGA, *Protecting Patients' Pocketbooks*, perma.cc/D9JZ-4VGW. Recently, FGA published a paper documenting the failure of hospital systems to comply with price transparency rules and urging policymakers at both the federal and state level to take action. Ex. E, at 2, ¶4; *see* Dublois & Ingram, *How America's Hospitals Are Hiding the Cost of Health Care*, FGA (Aug. 29, 2022), perma.cc/LH68-BSG4.

Price transparency is important to FGA's research and advocacy efforts. Ex. E, at 3, ¶7. To begin, FGA often advocates for more transparency in

healthcare pricing. *Id.* For example, FGA recently sued the Centers for Medicaid and Medicare Services in this Court under the FOIA statute for information on its lackluster enforcement of hospital price transparency rules. *Id.*; *see FGA v. CMS*, 2:22-cv-534 (M.D. Fla.). Price transparency is also important to FGA's ability to conduct research and promote policies based on that research. Ex. E, at 3, ¶8. Accurate price information allows FGA to conduct research to identify inefficiencies and policies that would improve the healthcare market. *Id.*

To fulfill its mission of promoting higher quality and more affordable healthcare for every American, FGA wants to obtain the pricing information for prescription drugs and in-network items and services required to be disclosed under the TiC Rule, use that information for its research and formulation of policy recommendations, and disseminate information about that research and the resulting policy recommendations to policymakers and the public. Ex. E, at 3-4, ¶9. For example, the TiC Rule calls for publication of the negotiated rates and historical net price of covered prescription drugs. *Id.* at 4, ¶10. If this information were available, FGA could conduct research on price discrepancies for the same prescription drug in the same market and pricing trends for prescription drugs. *Id.* Based on this research, FGA might conclude, for example, that policies permitting consumers to compare prices more easily would benefit the healthcare market or that a policy reform on

vertical integration in the pharmaceutical industry should be adopted. *Id.* FGA would then use the price information and resulting research to persuade policymakers and the public to support FGA's recommended policy reforms. *Id.*

The TiC Rule also calls for publication of the costs of covered in-network items and services in dollar amounts. *Id.* at 4, ¶11. If this information were available, FGA would similarly conduct research on in-network pricing to reach and advance policy suggestions. *Id.* For example, FGA has previously supported a policy allowing patients to count high-value out-of-network services and items toward their insurance deductibles. *Id.* Accurate information about in-network pricing might provide support for that policy proposal and permit FGA to more effectively persuade policymakers and the public to support that policy. *Id.* at 4-5, ¶11.

Section 1311 and the TiC Rule provide FGA and the public with a right to access this information. But FGA's access to this information and its ability to use the information to advance its mission have been frustrated by the Agencies' creation of categorical exceptions to the TiC Rule through FAQs. *Id.* at 4-5, ¶¶10-12.

## STANDARD OF REVIEW

Summary judgment is required if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The APA requires reviewing courts to "hold unlawful and set

aside agency action" taken "without observance of procedure required by law."

5 U.S.C. §706(2). When reviewing agency action, "the entire case on review is

a question of law" and "the district judge sits as an appellate tribunal." *Health*

*Freedom Def. Fund*, 599 F. Supp. 3d at 1156; *O.A. v. Trump*, 404 F. Supp. 3d

109, 125 (D.D.C. 2019).

## ARGUMENT

### I.   The Prescription Drug and Safe Harbor Policies are legislative rules that violate the APA.

The APA requires that an agency action be set aside if it is promulgated

"without observance of procedure required by law." 5 U.S.C. §706(2)(D). It also

mandates that agencies go through a statutory notice-and-comment process

when they issue "rules." 5 U.S.C. §553. A "rule" is "the whole or a part of an

agency statement of general or particular applicability and future effect

designed to implement, interpret, or prescribe law or policy or describing the

organization, procedure, or practice requirements of an agency." 5 U.S.C.

§551(4). Under this "broad definition" "virtually every statement an agency

may make" is a "rule." *Jean v. Nelson*, 711 F.2d 1455, 1474-77 (11th Cir. 1983);

*Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983);

*see, e.g.*, *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 77 (1st Cir. 2018) (FAQs); *Iowa*

*League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013) (letters to a Senator).

The notice-and-comment process is mandatory for all agency rules unless

covered by an exception. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

Congress required this process because it "'give[s] affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes.'" *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1343 (11th Cir. 2021); *see, e.g.*, *Int'l Union, United Mine Workers of Am. v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). It also "'afford[s] the agency a chance to avoid errors and make a more informed decision.'" *Hewitt*, 21 F.4th at 1343. Notice and comment thus protects against an unchecked administrative state. *Cf. Free Enter. Fund v. PCAOB*, 561 U.S. 477, 499 (2010) (warning against the risk that agencies "may slip from the Executive's control, and thus from that of the people").

The APA exempts "interpretive rules" from the notice-and-comment requirement, but "legislative rules" must go through notice and comment. 5 U.S.C. §553(b)(3). An agency rule with the "'force and effect of law'" is legislative regardless how the agency labels it. *Perez*, 575 U.S. at 96; *see, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021, 1024 (D.C. Cir. 2000). A rule is "legislative" if it "effectively amends a prior legislative rule," "adopts a new position inconsistent with existing regulations," or otherwise "effects a substantive change in existing law or policy." *Mendoza*, 754 F.3d at 1021, 1024 (cleaned up). In contrast, an interpretive rule "typically reflects an agency's construction of a statute" and does not "*modify* or *add* to a legal norm." *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (cleaned up).

The Prescription Drug Policy and Safe Harbor Policy are legislative rules subject to notice and comment. The Prescription Drug Policy indefinitely suspends the obligation to provide prescription-drug price information under the TiC Rule. *Compare* 45 C.F.R. §147.212(b) *with* Ex. C, at 1. Though the Agencies announced that they would not enforce the Rule while they go through "notice-and-comment rulemaking" to decide whether it remains "appropriate," they have taken no steps to begin that process over a year later. Ex. D, at 2. Yet their policy against any enforcement of the TiC's prescription-drug requirements remains in place more than a year after the TiC Rule's effective date. Thus, the Prescription Drug Policy is "tantamount to … revoking" the TiC Rule's prescription-drug requirements. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017). This revocation of a key component of the TiC Rule was a substantive change to the Rule. *See Mendoza*, 754 F.3d at 1021, 1024.

The real-world impacts of the Prescription Drug Policy confirm that it is a substantive rule. Health insurance issuers and group plans are failing to disclose the prescription drug information required by the TiC Rule with impunity. *See, e.g.*, United Healthcare, *Transparency in Coverage Rule*, perma.cc/7P4M-4GJC; Premera Blue Cross, *Transparency in Coverage Rule*, perma.cc/W2FK-E76U. The fact that major regulated entities are openly touting their refusal to abide by the terms of the TiC Rule illustrates that the

Prescription Drug Policy's suspension of the TiC prescription drug rules has the "'force and effect of law.'" *Perez*, 575 U.S. at 96.

The Agencies' description of the Prescription Drug Policy as a "defer[ral]" also illustrates that it is a legislative rule. Ex. C, at 1. Courts have recognized that "delaying" a rule is a substantive change that "has the status of law." *Clean Air Council*, 862 F.3d at 6. That is because a delay inevitably "affects regulated parties' 'rights or obligations'" by "reliev[ing]" them "of liability they would otherwise face." *Id.* at 7. This kind of legislative rule, like any other, is subject to notice and comment. *See, e.g.*, *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 113 (2d Cir. 2018) (collecting cases); *Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564, 571 (D.C. Cir. 2022).

The Safe Harbor Policy is also a legislative rule that requires notice and comment. The TiC Rule required health insurance issuers and group plans to report covered in-network rates in dollar amounts with no exceptions. But the Safe Harbor Policy removes that requirement for two categories of in-network rates: those where the plans and issuers use "alternative reimbursement arrangements" that make it difficult to "derive with accuracy specific dollar amounts contracted for covered items and services in advance of the provision," and those where insurers and group plans found it difficult to "disclose specific dollar amounts according to the schema" provided to them. Ex. D, at 2. This exemption of some costs from the TIC's Rule's requirement to report prices in

dollar amounts alters the legal obligations of group plans and health insurance issuers. *Compare* 45 C.F.R. §147.212(b) *with* Ex. D.

The creation of an alternative scheme of compliance shows that the Safe Harbor Policy established a new substantive standard for conduct. The Agencies not only issued a new rule, but also provided new guidance for how to report prices instead of using the dollar amounts required by the TiC Rule. Ex. D, at 3. This creation of a program for compliance through disclosure of information other than the information required by the TiC Rule would make sense only if the Safe Harbor Policy established a new legal standard.

As with the Prescription Drug Policy, the Agencies' description of this Policy as a "safe harbor" confirms that it is a legislative rule. The Supreme Court has held that "creating a … safe harbor" has real-world legal consequences. *United States v. Hawkes*, 578 U.S. 590, 598-99 (2016). Safe harbors "withdraw[] some of the discretion" agencies have over regulated entities. *Scenic America v. DOT*, 836 F.3d 42, 56 (D.C. Cir. 2016). And by constraining agencies, safe harbors also have "a clear legal effect" on regulated entities. *Id.*

## II.   This Court should vacate the Policies and grant declaratory and permanent injunctive relief.

### A.   This Court should set aside the Policies.

This Court should vacate the Prescription Drug Policy and the Safe Harbor Policy. The APA instructs a court to "hold unlawful and set aside"

procedurally invalid agency actions. 5 U.S.C. §706(2). Thus, vacatur is the "ordinary" APA remedy. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see, e.g.*, *Alabama v. CMS*, 674 F.3d 1241, 1244-45 (11th Cir. 2012) ("vacatur … vindicat[es] the notice-and-comment requirement"); *Data Mktg. P'ship v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022) (vacatur is the "default rule"); *NRDC v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (failure to go through notice and comment "'normally requires vacatur'"); *see also Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019); *Nat'l Mining Ass'n v. Sec'y of Labor*, 153 F.3d 1264, 1269 (11th Cir. 1998). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022).

Vacatur is especially important here because it is necessary to grant FGA relief. FGA seeks access to information to which it has a right under Section 1311 and the TiC Rule. It has a strong interest in accessing this information because it would use it for research and to advocate for its preferred policies. *See, e.g.*, *Protect Democracy Project, Inc. v. DOJ*, 498 F. Supp. 3d 132, 141 (D.D.C. 2020). Short of vacatur, there is no avenue for FGA's interests to be vindicated.

**B.      This Court should also grant declaratory and permanent injunctive relief.**

Beyond setting aside the policies, this Court should declare them procedurally invalid and enter a permanent injunction barring the Agencies from implementing them. Specifically, an injunction should require the Agencies to remove their implementation guidance permitting certain in-network items and services to be reported without dollar amounts and issue any guidance necessary to ensure timely reporting of prescription drug information required by the TiC Rule.

FGA is entitled to an injunction if it establishes (1) success on the merits; (2) an irreparable injury; (3) that other remedies, like damages, are not adequate; (4) that the balance of hardships favors an injunction; and (5) that an injunction would not disserve the public interest. *See, e.g.*, *W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023). The first factor—success on the merits—is satisfied for the reasons explained above. The other factors also weigh in favor of an injunction.

**1.      FGA will suffer irreparable harm without injunctive relief.**

FGA is suffering irreparable harm that cannot be remedied without an injunction as a result of the Agencies' improper change to the TiC Rule. This requirement is met when an injury "cannot be undone through monetary

remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010). FGA's injury is "obviously irreparable" under that standard. *Id.*

To begin, a plaintiff suffers irreparable harm when it is denied information despite a duty to disclose that information. *See, e.g.*, *Protect Democracy Project*, 498 F. Supp. 3d at 141. Denying access to "information that is highly relevant to an ongoing public debate" results in irreparable harm. *Id.* (cleaned up). FGA is seeking information that is highly relevant to public debates about healthcare policy—price information in the healthcare market. But it cannot access that information because of the Agencies' actions.

FGA's irreparable harm is further bolstered by the frustration of its First Amendment rights as a result of the Agencies' actions. FGA seeks the price information covered by the TiC Rule to aid in its goal of communicating to policymakers and the public about policy proposals to improve the healthcare system—activity at the core of the First Amendment. *See* Ex. E, at 3-5, ¶¶9-12. Its efforts have been frustrated, however, by the Agencies. This injury to First Amendment interests supports a finding of irreparable injury. *See, e.g.*, *Scott*, 612 F.3d at 1295 (cleaned up); *Cate v. Oldham*, 707 F.2d 1176, 1189-90 (11th Cir. 1983). And that injury cannot be remedied without the Agencies' action to provide for compliance with the TiC Rule.

### 2. A permanent injunction would serve the public interest and would not harm Defendants.

The public interest and balance of hardships weigh in favor of a permanent injunction. There is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Instead, the public interest weighs in favor of ensuring that "'governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* Since the Agencies failed to comply with the APA's requirements when issuing the Policies, the public interest and balance of hardships favors injunctive relief.

## CONCLUSION

For these reasons, the Court should grant Plaintiff summary judgment, vacate the Prescription Drug Policy and Safe Harbor Policy, declare the Policies unlawful, and enter a permanent injunction preventing the Agencies from implementing them.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff requests oral argument on this motion as explained in their separate filing on that issue.

Dated: June 19, 2022                    Respectfully Submitted,

                                        /s/ *Christian Bonta*
Jeffrey M. Harris (*pro hac vice*)      Michael A. Sasso
Gilbert Dickey (*pro hac vice*)         Fla. Bar No. 93814
Steven C. Begakis (*pro hac vice*)      Christian Bonta

CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
gilbert@consovoymccarthy.com
steven@consovoymccarthy.com


*Counsel for Plaintiff
The Foundation for Government
Accountability*

Fla. Bar No. 1010347
Sasso & Sasso, P.A.
1031 W. Morse Blvd., Ste. 120
Winter Park, FL 32789
(407) 644-7161
masasso@sasso-law.com
cbonta@sasso-law.com
wgory@sasso-law.com
notice@sasso-law.com


*Co-Counsel for Plaintiff
The Foundation for Government
Accountability*

**CERTIFICATE OF SERVICE**

I certify that on June 19, 2023, I filed this document on the CM/ECF

filing system, which will notify all registered counsel.

/s/  *Michael A. Sasso*